Slip Op. 10-12

UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| ANDAMAN SEAFOOD CO., LTD., *et al.*, <br><br> Plaintiffs, <br><br> – v – <br><br> UNITED STATES, <br><br> Defendant. | Before: Pogue, Judge <br><br> Court No. 09-00091 |

OPINION

[Plaintiffs' motion for judgment on agency record denied; Commerce's final Section 129 determination affirmed]

Dated: February 2, 2010

White & Case LLP (Walter J. Spak, Frank H. Morgan and Jay C. Campbell) for the Plaintiffs.

Tony West, Assistant Attorney General; Jeanne E. Davidson, Director; Patricia M. McCarthy, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (L. Misha Preheim), and, of counsel, Jonathan Zielinski, Office of Chief Counsel for Import Administration, United States Department of Commerce, for Defendant.

**Pogue, Judge:** This action raises the question of whether the government may choose to give only prospective effect to its decision to bring its administration of domestic antidumping law into compliance with international commitments.

Plaintiffs are producers/exporters of frozen warmwater shrimp from Thailand. Plaintiffs seek review of the Department of Commerce's ("Commerce" or "the Department") response to the

findings of a World Trade Organization ("WTO") panel regarding
the antidumping duty investigation of certain frozen warmwater
shrimp from Thailand.[1]  Specifically, Plaintiffs challenge
Commerce's partial, rather than total, revocation of the
antidumping order at issue, and the Department's decision to
apply only prospectively the revised antidumping margin contained
in the Final § 129 Determination, *i.e.*, the decision to apply the
recalculation of the Department's determinations of sales at less
than fair value ("LTFV"), the revised antidumping margin, solely
to subject merchandise entered, or withdrawn from warehouse, for
consumption on or after the effective date of that Final § 129
Determination.  Plaintiffs contend that in declining to apply the
revocation of the antidumping order to unliquidated entries
predating the effective date of implementation of the Final § 129
Determination, the Department acted contrary to law. (Compl.
¶ 16.)[2]

---

[1] See Implementation of the Findings of the WTO Panel in
United States – Antidumping Measure on Shrimp from Thailand,
74 Fed. Reg. 5,638 (Dep't Commerce Jan. 30, 2009) (notice of
determination under Section 129 of the Uruguay Round Agreements
Act ("URAA"), 19 U.S.C. § 3538 ("Section 129"), and partial
revocation of the antidumping duty order on frozen warmwater
shrimp from Thailand) ("Final § 129 Determination").

[2] In their complaint, Plaintiffs also claim that Commerce
improperly failed to exclude from the antidumping duty order two
additional companies, which were non-existent or inoperational at
the time of the original investigation but were subsequently
found by the Department to be collapsible into the Rubicon Group.
(Compl. ¶¶ 17-18.)  On October 13, 2009, Commerce excluded these

The court has jurisdiction over this case pursuant to
28 U.S.C. § 1581(c).[3]  Because domestic law permits the agency's
determination, the court concludes that the Department did not
act contrary to law.

## BACKGROUND

This action stems from Commerce's 2005 antidumping duty
order covering certain frozen warmwater shrimp from Thailand that
were entered or withdrawn from warehouse for consumption on or
after August 4, 2004 (the "subject merchandise"). See Certain
Frozen Warmwater Shrimp from Thailand, 70 Fed. Reg. 5,145 (Dep't
Commerce Feb. 1, 2005) (notice of amended final determination of
sales at less than fair value and antidumping duty order) ("Final

---

two companies from the order, following a changed circumstances
review. Certain Frozen Warmwater Shrimp from Thailand,
74 Fed. Reg. 52,452 (Dep't Commerce Oct. 13, 2009) (final results
of antidumping duty changed circumstances review and notice of
revocation in part). Accordingly, this issue is now moot, and
Plaintiffs are no longer pursuing their claim in this regard.
(See Def.'s Mem. in Opp'n to [Pls.'] Rule 56.2 Mot. for J. Upon
Agency R. 2 n.1; Pls.' Reply Br. ("Pls.' Reply") 1 n.1).

[3] 28 U.S.C. § 1581(c) ("The Court of International Trade
shall have exclusive jurisdiction of any civil action commenced
under section 516A of the Tariff Act of 1930."); Section 516A of
the Tariff Act of 1930, as amended, 19 U.S.C. §§ 1516a(a)(2)
(A)(i)(III) & (B)(vii) ("Within thirty days after [] the date of
publication in the Federal Register of . . . notice of the
implementation of [a determination under Section 129 of the URAA]
. . ., an interested party . . . may commence an action in the
United States Court of International Trade by filing a summons,
and within thirty days thereafter a complaint . . ., contesting
any factual findings or legal conclusions upon which the
determination is based.").

Determination & Order"); see also Sections 731-36 of the Tariff

Act of 1930, as amended, 19 U.S.C. §§ 1673-73e(a) (2006).[4]  The

subject merchandise included goods that Plaintiffs produced or

exported.

In its Final Determination & Order, Commerce calculated

Plaintiffs' dumping margins by using a "zeroing" methodology.[5]

The Department's use of this methodology was challenged at the

WTO, and, in response to this challenge, a WTO dispute settlement

panel concluded that the United States – by employing zeroing to

calculate dumping margins in the Final Determination & Order –

acted inconsistently with Article 2.4.2 of the Agreement on

Implementation of Article VI of the General Agreement on Tariffs

and Trade 1994 ("WTO Antidumping Agreement").  The WTO panel

recommended that the United States bring its dumping

determination into conformity with its obligations under the

relevant WTO agreements. Panel Report, United States – Measures

Relating to Shrimp from Thailand, ¶¶ 2.2, 8.2, 8.6, WT/DS343/R

(Feb. 29, 2008) ("U.S. – Shrimp (Thailand) Panel Report"). (See

---

[4] Further citation to the Tariff Act of 1930, as amended, is
to Title 19 of the U.S. Code, 2006 edition.

[5] "Zeroing" is a methodology "whereby only positive dumping
margins (i.e., margins for sales of merchandise sold at dumped
prices) were aggregated, and negative margins (i.e., margins for
sales of merchandise sold at nondumped prices) were given a value
of zero." Corus Staal BV v. Dep't of Commerce, 395 F.3d 1343,
1345-46 (Fed. Cir. 2005).  The effect of "zeroing" may be to
increase the amount of the antidumping duty ordered.

also Compl. ¶ 7.)

The United States did not appeal the panel's conclusion in this respect,[6] and the panel's report was adopted by the WTO Dispute Settlement Body ("DSB") on August 1, 2008. Action by Dispute Settlement Body, <u>United States – Measures Relating to Shrimp from Thailand</u>, WT/DS343/14 (Aug. 7, 2008). (<u>See also</u> Compl. ¶ 7.)[7]

Following the DSB decision, the government entered into the statutory process to determine whether and how to respond. <u>See</u> 19 U.S.C. § 3538.  Specifically, on November 14, 2008, Commerce "advised interested parties that it was initiating a proceeding under section 129 of the URAA . . . that would implement the findings of the WTO dispute settlement panel in [<u>U.S. – Shrimp (Thailand)</u> Panel Report]." <u>Final § 129 Determination</u>, 74 Fed. Reg. at 5,638. <u>See also</u> 19 U.S.C. § 3538(b).[8]  The

---

[6] <u>See</u> Appellate Body Report, <u>United States – Measures Relating to Shrimp from Thailand</u>, ¶ 181, WT/DS343/AB/R (July 16, 2008) (listing issues raised on appeal).

[7] Pursuant to Article 21.3(b) of the Understanding on Rules and Procedures Governing the Settlement of Disputes ("DSU"), the disputing parties agreed that the reasonable period of time for the United States to implement the recommendations and rulings of the DSB in this dispute would expire on April 1, 2009. Agreement under Article 21.3(b) of the DSU, <u>United States – Measures Relating to Shrimp from Thailand</u>, WT/DS343/16 (Nov. 4, 2008).

[8] "Congress has established two procedures by which a negative WTO decision may be implemented into domestic law.  The first method, a Section 123 proceeding, is the mechanism to amend, rescind, or modify an agency regulation or practice in

Department then issued its preliminary results, on November 21,

2008, and, after receiving comments and rebuttal comments from

the interested parties, the Department issued its final results

on January 12, 2009.  In its final results, the Department

recalculated the weighted-average dumping margins from the

antidumping investigation without zeroing, i.e.,  by applying the

calculation methodology described in Antidumping Proceedings:

Calculation of the Weighted-Average Dumping Margin During an

Antidumping Investigation, 71 Fed. Reg. 77,722 (Dep't Commerce

Dec. 27, 2006) (final modification). Final § 129 Determination,

74 Fed. Reg. at 5,638-39.

    Continuing the statutory process, "the [United States Trade

Representative ("USTR")] held consultations with the Department

and the appropriate congressional committees with respect to this

determination [as required by section 129(b)(3) of the URAA],"

id. at 5,638, and, on January 16, 2009, "in accordance with

sections 129(b)(4) and 129(c)(1)(B) of the URAA, the USTR

_____

order to implement a decision by the WTO that such is
inconsistent with U.S. treaty obligations. [. . .]  The second
method, a Section 129 proceeding, is [more] discrete[, i.e.,]
Section 129 sets forth a procedure to implement a negative WTO
decision with respect to a specific agency determination that the
WTO found [insufficient to] support an unfair trade order." Corus
Staal BV v. United States, __ CIT __, __, 593 F. Supp. 2d 1373,
1377-78 n.11 (2008) (internal emphasis, alteration, quotation
marks and citations omitted). See also U.S. Steel Corp. v. United
States, __ CIT __, __, 637 F. Supp. 2d 1199, 1205-06 (2009);
Acciaierie Valbruna S.p.A. v. United States, No. 08-00381, 2009
WL 2190188, at *2 n.5 (CIT July 23, 2009).

directed the Department to implement in whole this
determination." Id. See also 19 U.S.C. § 3538(b)(4).

Accordingly, on January 30, 2009, Commerce issued notice of
its determination under Section 129, stating that the Department
will apply the recalculated weighted-average dumping margins from
the antidumping investigation of frozen warmwater shrimp from
Thailand to subject merchandise entered or withdrawn from
warehouse for consumption on or after January 16, 2009, the
effective date of the determination. Final § 129 Determination at
5,639; see 19 U.S.C. § 3538(c)(1)(B) (determination under Section
129 shall apply to entries made on or after "the date on which
the Trade Representative directs [Commerce] to implement that
determination").

The re-calculated margins for Plaintiffs were de minimis,
Final § 129 Determination, 74 Fed. Reg. at 5,639; see 19 U.S.C.
§ 1673b(b)(3) (defining de minimis as less than two percent).
Based on this finding, the Department partially revoked the
antidumping order with respect to Plaintiffs, effective for all
entries of the subject merchandise entered on or after January
16, 2009, the effective date of the recalculation. Final § 129
Determination, 74 Fed. Reg. at 5,639; Partial Revocation of
Antidumping Duty Order on Certain Frozen Warmwater Shrimp from
Thailand Produced and Exported by the Rubicon Group Co's, A-549-
822 (CBP Feb. 23, 2009), Admin. R. Pub. Doc. 44; see also 19

U.S.C. 1673d(a)(4) (Commerce shall disregard *de minimis* dumping

margins).

Plaintiffs now challenge the Final § 129 Determination,

arguing that, first, the United States retains no legal authority

to assess antidumping duties on Plaintiffs' prior unliquidated

entries (*i.e.*, unliquidated entries made prior to January 16,

2009 – the effective date of the Section 129 recalculation and

partial revocation of the dumping order) because "the effect of

the Section 129 Determination was to invalidate the original LTFV

determination with respect to the [Plaintiffs]" (Mem. of P. & A.

in Supp. of Pls.' USCIT R. 56.2 Mot. for J. on Agency R. ("Pls.'

Mem.") 8), and "[t]he U.S. antidumping law mandates that

antidumping duties can only be assessed when there is a valid

determination of dumping" (id. at 11 (citing 19 U.S.C. § 1673)).

Plaintiffs rely on Laclede Steel Co. v. United States,

20 CIT 712, 928 F. Supp. 1182 (1996); Jilin Henghe Pharm. Co. v.

United States, 28 CIT 969, 342 F. Supp. 2d 1301 (2004), vacated

as moot, 123 F. App'x 402 (Fed. Cir. 2005); and Tembec, Inc. v.

United States, 30 CIT 1519, 461 F. Supp. 2d 1355 (2006), judgment

vacated, 31 CIT 241, 475 F. Supp. 2d 1393 (2007) (hereinafter

collectively referred to as the "Laclede line" of cases), for the

proposition that "[o]nce Commerce's final antidumping

determination has been invalidated, it cannot serve as a legal

basis for the imposition of antidumping duties." (Id. at 12

(quoting Jilin, 28 CIT at 978, 342 F. Supp. 2d at 1309-10); see generally id. at 11-14.)

Second, Plaintiffs argue that Commerce's decision not to apply the Section 129 recalculation and partial revocation of the dumping order to those of Plaintiffs' unliquidated entries that were entered prior to the Section 129 determination is not consistent with the United States's international obligations under the WTO agreements, and therefore contrary to law, pursuant to Murray v. Schooner Charming Betsy, 6 U.S. (2 Cranch.) 64, 118 (1804) ("[A]n act of Congress ought never to be construed to violate the law of nations if any other possible construction remains . . . ."). (Compl. ¶ 16.)

Plaintiffs rely on two other WTO Appellate Body Reports, United States – Measures Relating to Zeroing and Sunset Reviews, Recourse to Article 21.5 of the DSU by Japan, WT/DS322/AB/RW (Aug. 18, 2009), and United States – Laws, Regulations and Methodology for Calculating Dumping Margins ("Zeroing"), Recourse to Article 21.5 of the DSU by the European Communities, WT/DS294/AB/RW (May 14, 2009) (Pls.' Mem. 16-18) for the proposition that "the WTO Agreements establish that prospective compliance means applying a measure that is WTO-consistent after the compliance period ends – irrespective of when the entries occurred." (Id. at 17-18.)  Invoking Allegheny Ludlum Corp. v. United States, 29 CIT 157, 173, 358 F. Supp. 2d 1334, 1348 (2005)

("[Where] Congress has not statutorily created an unavoidable
conflict with the WTO, there exists no reason not to look to the
WTO for assistance in interpreting U.S. law" (citations omitted))
(relying on Charming Betsy, 6 U.S. (2 Crach) at 118; Fed. Mogul
Corp. v. United States, 63 F.3d 1572, 1582 (Fed. Cir. 1995)),
Plaintiffs argue that, consistent with the cited Appellate Body
reports, Section 129 should be interpreted to apply to all
entries of subject merchandise which remain unliquidated at the
time that the Final § 129 Determination is implemented. (See
Pls.' Mem. 16-19.)

As explained below, the court rejects both of Plaintiffs'
arguments.

### STANDARD OF REVIEW

In an action brought, as here, under Section 516A of the
Tariff Act of 1930, the court shall "hold unlawful any [agency]
determination, finding, or conclusion found . . . to be
unsupported by substantial evidence on the record, or otherwise
not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). See
also, e.g., PAM S.p.A. v. United States, 582 F.3d 1336, 1339
(Fed. Cir. 2009).  In considering legal issues, if a statutory
provision directly addresses the question at issue, its plain
meaning controls. Nippon Steel Corp. v. United States, 337 F.3d
1373, 1380 (Fed. Cir. 2003) ("'If the intent of Congress is
clear, that is the end of the matter; for the court, as well as

the agency, must give effect to the unambiguously expressed intent of Congress.'" (quoting <u>Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.</u>, 467 U.S. 837, 842-43 (1984))); <u>Timex V.I., Inc. v. United States</u>, 157 F.3d 879, 882 (Fed. Cir. 1998) ("Because a statute's text is Congress' final expression of its intent, if the text answers the question, that is the end of the matter.").

**DISCUSSION**

1.  <u>The Section 129 Determination Did Not Invalidate the Antidumping Order.</u>

The <u>Laclede</u> line of cases stand for the established principle that an invalid antidumping determination cannot serve as a legal basis for the imposition of antidumping duties. Thus, under the <u>Laclede</u> line, once an agency determination is ruled to have been invalid, all affected unliquidated entries must be liquidated in accordance with that ruling, regardless of their date of entry.

Nevertheless, Plaintiffs cannot successfully invoke the <u>Laclede</u> line's principle here, because the underlying antidumping order in this case has not been invalidated. Rather, on its face, the <u>Final § 129 Determination</u> is a "partial" and prospective revocation of the underlying order. As a matter of law, the statutory provisions under which the <u>Final § 129 Determination</u> is issued explicitly provides for such a

determination.  By the statute's plain terms, a determination

implemented pursuant to Section 129 "shall apply with respect to

unliquidated entries of the subject merchandise . . . that are

entered, or withdrawn from warehouse, for consumption on or after

. . . the date on which the Trade Representative directs

[Commerce] . . . to implement that determination." 19 U.S.C.

§ 3538(c)(1).  The statute does not specify that a Section 129

determination must be implemented retroactively.  Accordingly,

regardless of whether the agency may reasonably interpret the

statute to apply to *all* unliquidated entries of subject

merchandise (a question the court need not and does not decide

here), it is clear that, at the very least, the law explicitly

contemplates the application of determinations made under its

auspices solely to entries made on or after January 16, 2009, the

date on which the USTR directed its implementation – that is, the

law explicitly permits the route adopted by Commerce in this

case.

Moreover, the statute's plain language is buttressed by the

Statement of Administrative Action:

> Consistent with the principle that GATT panel
> recommendations apply only prospectively, subsection
> 129(c)(1) provides that where determinations by . . .
> Commerce are implemented under subsection[] . . . (b),
> such determinations have *prospective effect only*.  That
> is, they apply to unliquidated entries of merchandise
> entered, or withdrawn from warehouse, for consumption
> on or after the date on which the Trade Representative
> directs implementation.  Thus, *relief available under*

> *subsection 129(c)(1) is distinguishable from relief
> available in an action brought before a court or a
> NAFTA binational panel, where, depending on the
> circumstances of the case, retroactive relief may be
> available*. Under 129(c)(1), if implementation of a WTO
> report should result in the revocation of an
> antidumping [] duty order, entries made prior to the
> date of [the] Trade Representative's direction would
> remain subject to potential duty liability.

Statement of Administrative Action to the Uruguay Round

Agreements Act, H.R. Rep. No. 103-316, at 1026 (1994), reprinted

in 1994 U.S.C.C.A.N. 4040, 4313 ("URAA SAA") (emphasis added).

It is clear, therefore, that Commerce's determination under

Section 129 – in response to a DSB decision that the agency's

action is not consistent with the WTO Antidumping Agreement – has

a very different effect than a decision of a U.S. Court or a

North American Free Trade Agreement ("NAFTA") Panel[9] that such an

action was from the beginning inconsistent with U.S. antidumping

law.  The plain language of the statute provides that Commerce is

_____

[9] See NAFTA Art. 1904.2 ("An involved Party may request that
a panel review, based on the administrative record, a final
antidumping [] determination of a competent investigating
authority of an importing Party to determine whether such
determination was in accordance with the antidumping [] law *of
the importing Party*.  For this purpose, the antidumping [] law
consists of the relevant statutes, legislative history,
regulations, administrative practice and judicial precedents to
the extent that a court of the importing Party would rely on such
materials in reviewing a final determination of the competent
investigating authority.  Solely for purposes of the panel review
provided for in this Article, the antidumping [] statutes of the
Parties, as those statutes may be amended from time to time, are
incorporated into and made a part of this Agreement." (emphasis
added)).

to apply a determination under Section 129 prospectively, *i.e.*,
to entries made on or after the date on which the USTR directs
its implementation.  There is nothing on the face of the law to
suggest that its effect is to invalidate the original
determination in so far as that original determination applies to
entries not explicitly covered by the terms of Section 129.  To
the contrary, the Department's use of zeroing in arriving at an
affirmative LTFV determination – the basis of the challenge and
consequent adverse decision in the WTO – has been consistently
upheld by U.S. courts as a matter of U.S. law.[10]

---

[10] See Timken Co. v. United States, 354 F.3d 1334, 1343
(Fed. Cir. 2004) ("According Commerce its proper deference, we
hold that it reasonably interpreted [19 U.S.C.] § 1677(35)(A) to
allow for zeroing."); see also id. at 1344 (refusing "to overturn
the zeroing practice" based on a WTO Appellate Body decision);
Corus Staal BV v. United States, 502 F.3d 1370, 1372 (Fed. Cir.
2007) ("[The Federal Circuit] has held that although the
antidumping statutes do not require the use of zeroing in
calculating dumping margins, Commerce's zeroing methodology is a
permissible interpretation of the statutory provisions."
(citations omitted)); U.S. Steel, __ CIT at __, 637 F. Supp. 2d
at 1210 ("[T]he Federal Circuit has repeatedly found that the
pertinent antidumping statutes do not unambiguously reveal
Congress's position on the issue of zeroing . . . ." (citations
omitted)); id. at 1212 ("In recognition of Commerce's expertise
in the field of antidumping law, the court owes substantial
deference to the agency when it interprets an ambiguous
antidumping statute." (citation omitted)).  In Antidumping
Proceedings: Calculation of the Weighted-Average Dumping Margin
During an Antidumping Investigation, 71 Fed. Reg. 77,722 (Dep't
Commerce Dec. 27, 2006) (final modification), Commerce announced
that it will no longer employ the zeroing methodology in
investigations using average-to-average comparisons. See Corus
Staal, 502 F.3d at 1373 n.1 (defining average-to-average
valuation). However, "[i]t is clear that Commerce intends to
apply its new policy on zeroing only prospectively." Id. at 1374.

Unlike the case at bar, in each of the <u>Laclede</u> line of cases, the relevant agency determination was held, by either a U.S. Court or a NAFTA Panel,[11] not to have been validly propagated *as a matter of U.S. law*.[12] That is, in each of these cases, the court held that, because the agency determination had been made contrary to the U.S. antidumping statute, that determination was never validly made, and that therefore no

---

[11] <u>See</u> *supra* note 9.

[12] With respect to <u>Laclede</u>, <u>see</u> <u>Laclede</u>, 20 CIT at 716, 928 F. Supp. at 1187 (holding that Commerce must apply the rate affirmed by the court after remand to unliquidated entries made prior to the court's decision invalidating Commerce's initial assessment); <u>Laclede Steel Co. v. United States</u>, 18 CIT 965 (1994) (invalidating Commerce's initial determination as a matter of U.S. law).  With respect to <u>Jilin</u>, <u>see</u> <u>Jilin</u>, 28 CIT at 969-70, 342 F. Supp. 2d at 1303 ("Commerce's liquidation instructions seek to impose antidumping duties on Plaintiffs' entries pursuant to an antidumping order which was invalidated, with regard to Plaintiffs, by the Court's decision in <u>Rhodia, Inc. v. United States</u>, 26 CIT 1107, 240 F. Supp. 2d 1247 (2002)."); <u>Rhodia</u>, 26 CIT at 1108, 240 F. Supp. 2d at 1249 (noting that the court initially remanded the case back to Commerce because its determination was not supported by substantial evidence, in violation of U.S. law).  With respect to <u>Tembec</u>, <u>see</u> <u>Tembec</u>, 30 CIT at 1524-32, 461 F. Supp. 2d at 1360-67 (holding that the revocation of an antidumping order as a result of its invalidation by a NAFTA panel applies to unliquidated entries made prior to <u>Timken</u> notice because it was "the intent of Congress that there be the same results with respect to refunds [of cash deposits] whether an appeal is taken to a NAFTA panel or this Court"); <u>Tembec, Inc. v. United States</u>, 30 CIT 958, 441 F. Supp. 2d 1302 (2006) (holding the antidumping order invalid as a matter of U.S. law because injury determination was invalidated by NAFTA panel); <u>id.</u> at 961, 1308 ("The NAFTA Panel issued its decision . . . ., finding that the [International Trade Commission]'s injury determination was not supported by substantial evidence or in accordance with U.S. law.").

outstanding entries may be liquidated on the basis of such agency
action.

Here, on the other hand, the successful challenge to
Commerce's initial antidumping order was made at the level of the
WTO DSB, which concluded, on the basis of the WTO Antidumping
Agreement, that regardless of its validity as a matter of U.S.
antidumping law, this determination had been made contrary to
international agreement. See U.S. – Shrimp (Thailand) Panel
Report at ¶¶ 2.2, 8.2, 8.6.  The question before the court,
therefore, is whether the effect of a determination made pursuant
to Section 129 – the statute used to implement the response of
the United States, as a matter of domestic law, to the DSB's
recommendations in U.S. – Shrimp (Thailand) Panel Report – is the
same as a holding by a U.S. court that the initial challenged
determination was issued in a manner that was contrary to law.
The court concludes that it is not.

A Section 129 proceeding responds, inter alia, to a WTO DSB
decision that a particular agency determination is not consistent
with the United States' obligations as a Member of the WTO
Antidumping Agreement. See 19 U.S.C. § 3538(b).  As this Court
explained in Tembec[13]:

---

[13] Although the judgment in Tembec was vacated due to
settlement, the decision itself was not withdrawn. Tembec, 31 CIT
at 251, 475 F. Supp. 2d at 1402.

> Unlike litigation before the court or a NAFTA panel,
> WTO Members are not required automatically to comply
> with the recommendations of a WTO panel or the
> [Appellate Body]. While compliance is encouraged, the
> DSU contemplates three different responses to an
> adverse WTO panel report. A Member may elect to bring
> its domestic practices in line with the WTO's
> recommendations. Alternatively, Members may substitute
> a compensatory trade agreement that lowers other
> barriers to trade while leaving an objectionable
> practice in place. Finally, a Member may choose not to
> comply with the WTO's recommendation.

Tembec, 30 CIT at 984-85, 441 F. Supp. 2d at 1328 (citing URAA

SAA at 1008-09[14]). Accordingly, "Congress fashioned section 129

to allow the United States to take full advantage of its remedial

options before the WTO." Id. (footnote omitted).

In this case, Commerce, the USTR, and the pertinent

Congressional committees deemed a prospective partial revocation

and recalculation of dumping margins under Section 129 to be the

appropriate response to the WTO panel decision in U.S. – Shrimp

(Thailand). See Final § 129 Determination. Consequently, in this

_____

[14] URAA SAA at 1008-09 ("It is important to note that the []
WTO dispute settlement system does not give panels any power to
order the United States or other countries to change their laws.
If a panel finds that a country has not lived up to its
commitments, all a panel may do is recommend that the country
begin observing its obligations. It is then up to the disputing
countries to decide how they will settle their differences. The
defending country may choose to make a change in its law. Or it
may decide instead to offer trade 'compensation' – such as lower
tariffs. The countries concerned could agree on compensation or
on some other mutually satisfactory solution. Alternatively, the
defending country may decide to do nothing. In that case, the
country that lodged the complaint may retaliate by suspending
trade concessions equivalent to the trade benefits it has
lost.").

case, the Department's recalculations pursuant to Section 129,
which resulted in *de minimis* rates for Plaintiffs, are
permissibly applicable solely to entries made on or after the
date on which the USTR directed implementation of the Section 129
determination. 19 U.S.C. § 3538(c)(1)(B).[15]  The resulting
partial revocation of the antidumping order with respect to
Plaintiffs, see Final § 129 Determination, is therefore similarly
applicable to the same set of entries – those made on or after
the effective date of implementation of the Section 129
determination.

Because the recalculation on which the partial revocation is
based applies to entries made on or after its date of
implementation, "[c]onsistent with the principle that GATT panel
recommendations apply only prospectively," URAA SAA at 1026, and
because the Department's initial calculations, leading to a
determination of sales at LTFV using a zeroing methodology, have
not been invalidated as a matter of U.S. law,[16] the LTFV
determination and any antidumping duties assessed on its basis
remain in effect with respect to entries not covered by the

_____

[15] See also Acciaierie Valbruna, 2009 WL 2190188, at *1 n.1
("The plain language of Section 129 of the URAA provides that a
determination made under that provision has prospective effect,
thereby applying only to entries made on or after the date the
[USTR] directs [Commerce] to implement the decision." (citing
19 U.S.C. § 3538(c)(1)(B))).

[16] See *supra* note 10.

Section 129 recalculation – that is, with respect to all entries
of subject merchandise made prior to the date of implementation
of that determination. <u>Accord</u> <u>Corus Staal</u>, __ CIT at __, 593 F.
Supp. 2d at 1386 (noting that Commerce's use of zeroing to
calculate dumping margins is not unlawful as a matter of U.S.
law, and concluding accordingly that "Commerce did not err when
it instructed Customs to impose antidumping duties on Corus's
entries of [the subject merchandise] given the valid
determination of dumping and assumption of injury at the time
these entries were made"). <u>See also</u> <u>Corus Staal</u>, 502 F.3d at
1373-75 (upholding Commerce's decision not to alter an
administrative review determination "as a result of the post-POR
prospective revocation of the order" pursuant to a Section 129
recalculation (quotation marks and citation omitted)); 19 U.S.C.
§ 1675(d)(3) (determination to revoke order shall apply to
unliquidated entries entered "on or after the dates determined by
the administering authority"); <u>Trs. in Bankr. of N. Am. Rubber</u>
<u>Thread Co. v. United States</u>, 30 CIT 1537, 1542 n.8, 464 F. Supp.
2d 1350, 1355-56 n.8 (2006) ("Commerce's exclusive authority
includes establishing the effective date of revocation."
(citations omitted)).

　　　Plaintiffs therefore improperly rely on <u>Laclede</u>, <u>Jilin</u>, and
<u>Tembec</u>. Because the Department's original LTFV determination
with respect to certain frozen warmwater shrimp from Thailand has

not been held to have been invalidly made as a matter of U.S.
law, its use as a basis for the assessment of duties on entries
made prior to the effective date of the order's revocation is not
contrary to the statute. See 19 U.S.C. §§ 1673e; 3538(c)(1).

2.  Application of the *Charming Betsy* Principle Does Not Alter
    the Effect of Section 129.

     Plaintiffs also argue that Section 129 should be interpreted
so as to be consistent with WTO Appellate Body decisions,
pursuant to the principle expressed by the Supreme Court in
Charming Betsy, 6 U.S. (2 Cranch.) at 118 ("[A]n act of Congress
ought never to be construed to violate the law of nations if any
other possible construction remains . . . ."); see also Norsk
Hydro Canada, Inc. v. United States, 472 F.3d 1347, 1360 n.21
(Fed. Cir. 2006) ("The rule of interpretation announced in
[Charming Betsy] instructs that domestic law should be
interpreted consistently with American international obligations
to the degree possible."). Plaintiffs claim that WTO decisions
require that, once the reasonable implementation period agreed
upon by parties to a WTO dispute has expired (in this case, on
April 1, 2009), any remaining unliquidated entries of subject
merchandise must, in accordance with the DSU, be liquidated in a
manner not inconsistent with the recommendations of the DSB.[17]

_____

[17] (Pls.' Mem. 16-19 (relying on Appellate Body Report,
United States – Measures Relating to Zeroing and Sunset Reviews,
Recourse to Article 21.5 of the DSU by Japan, WT/DS322/AB/RW

As already noted however, the clear intent of Congress in adopting Section 129 of the URAA was "to allow the United States to take full advantage of its remedial options before the WTO." Tembec, 30 CIT at 985, 441 F. Supp. 2d at 1328 (citing URAA SAA at 1008-09; 19 U.S.C. § 3538[]).  The URAA was accordingly expressly designed so as to preserve the independence of U.S. law from adverse decisions of the DSB until such time as the political branches decide that, of the options available to the United States under the WTO Agreements, a change in U.S. law and/or policy or methodology is most appropriate. See id.

In this case, applying the Plaintiffs' interpretation of WTO precedent to compel Commerce to retroactively apply its partial revocation of the antidumping order to entries made prior to the effective date of that partial revocation would run counter to the clear and unambiguous meaning of current U.S. law.  As explained above, the antidumping order in question was never invalidated as a matter of U.S. law.  Accordingly, it remains in effect for all entries of subject merchandise entered on or after the effective date of the order until the effective date of its partial revocation. See 19 U.S.C. §§ 1673e; 1675(d)(3).  To the extent that Plaintiffs are correct that the application of this

_____

(Aug. 18, 2009); and Appellate Body Report, United States – Laws, Regulations and Methodology for Calculating Dumping Margins ("Zeroing"), Recourse to Article 21.5 of the DSU by the European Communities, WT/DS294/AB/RW (May 14, 2009)).)

statutory scheme to some subset of their unliquidated entries

conflicts with U.S. obligations under the WTO Agreements (another

question that the court need not, and does not decide here), that

matter is for the WTO to decide, and, if appropriate, for further

proceedings by the executive agencies in accordance with the

statutory scheme.

### CONCLUSION

For all of the foregoing reasons, Plaintiffs' Motion for

Judgment on the Agency Record is DENIED.  Judgment will be

entered for Defendant.

It is SO ORDERED.

                                      /s/ Donald C. Pogue
                                     Donald C. Pogue, Judge

Dated:    February 2, 2010
          New York, N.Y.

UNITED STATES COURT OF INTERNATIONAL TRADE

```
┌──────────────────────────────────────┐
│ ANDAMAN SEAFOOD CO., LTD., et         │
│ al.,                                  │
│                                       │
│                   Plaintiffs,         │
│                                       │
│    – v –                              │
│                                       │
│ UNITED STATES,                        │
│                                       │
│                   Defendant.          │
└──────────────────────────────────────┘
```

Before: Pogue, Judge

Court No. 09-00091

## <u>JUDGMENT</u>

This case having been duly submitted for decision; and the court, after due deliberation, having rendered a decision herein; now therefore, in conformity with said decision, it is hereby

ORDERED, ADJUDGED and DECREED that Plaintiffs' USCIT Rule 56.2 Motion for Judgment on the Agency Record is DENIED; and it is further

ORDERED, ADJUDGED and DECREED that the Department of Commerce's determinations in <u>Implementation of the Findings of the WTO Panel in United States – Antidumping Measure on Shrimp from Thailand</u>, 74 Fed. Reg. 5,638 (Dep't Commerce Jan. 30, 2009) (notice of determination under Section 129 of the Uruguay Round Agreements Act and partial revocation of the antidumping duty order on frozen warmwater shrimp from Thailand) are AFFIRMED.

   /s/ Donald C. Pogue   
Donald C. Pogue, Judge

Dated:    February 2, 2010
          New York, N.Y.

## NOTICE OF ENTRY AND SERVICE

This is a notice that an order or judgment was entered in the docket of this action, and was served upon the parties on the date shown below.

Service was made by depositing a copy of this order or judgment, together with any papers required by USCIT Rule 79(c), in a securely closed envelope, proper postage attached, in a United States mail receptacle at One Federal Plaza, New York, New York 10278 and addressed to the attorney of record for each party at the address on the official docket in this action, except that service upon the United States was made by personally delivering a copy to the Attorney-In-Charge, International Trade Field Office, Civil Division, United States Department of Justice, 26 Federal Plaza, New York, New York 10278 or to a clerical employee designated, by the Attorney-In-Charge in a writing filed with the clerk of the court.

or

Service was made electronically, by the Court's CM/ECF system, upon those parties that have filed a Notice of Consent to Electronic Service.

Tina Potuto Kimble
Clerk of the Court

Date: _____     By: _____
                                                    Deputy Clerk